CSD 1161 [05/15/03]

Name, Address, Telephone No. & I.D. No.
Loran Kelley, Jr.
14781 Pomerado Rd., #169
Poway, CA 92064

(760)207-8301

```
                                    FILED

                            12 FEB -7  AM 9:34

                                CLERK
                        U.S. BANKRUPTCY CT.
                        SO. DIST. OF CALIF.
```

## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF CALIFORNIA
325 West "F" Street, San Diego, California 92101-6991

| | |
|---|---|
| In Re   Loran Kelley, Jr. | BANKRUPTCY NO.  12-00246-MM11 |
| _____Debtor. | |
| Kondaur Capital Corporation | RS NO.  JKB-01 |
| _____Moving Party | |
| Loran Kelley, Jr., Debtor in Possession | Hearing Date: 2/23/12 |
| _____Respondent(s) | Hearing Time: 3:00 p.m. |

## OPPOSITION TO MOTION FOR RELIEF FROM AUTOMATIC STAY
### [x]  REAL PROPERTY      [ ]  PERSONAL PROPERTY

    Respondent in the above-captioned matter moves this Court for an Order denying relief from the automatic stay on the grounds set forth below.

1.     A Petition under Chapter  [ ] 7  [X] 11  [ ] 12  [ ] 13  was filed on 1/10/12_____.

2.     Procedural Status:
    a.   [ ]  Name of Trustee Appointed *(if any)*:

    b.   [ ]  Name of Attorney of Record for Trustee *(if any)*:

    c.   [x]  *Prior Filing Information:
        Debtor has previously filed a Bankruptcy Petition on:1/14/02_____.
        If applicable, the prior case was dismissed on: __3/22/02_____.

    d.   [ ]  *(If Chapter 13 case)*:  Chapter 13 Plan was confirmed on _____ or a confirmation hearing is set for _____.

3.     *Number of unsecured creditors 4_____. Amount of unsecured debt $ 106,881.00_____.

4.     *Last operating report filed:N/A_____.

5.     *Disclosure statement:  Filed? (yes/no)__No____. Approved?  (yes/no) No._____.
    If yes, date of plan confirmation hearing:_____.

_____

*Only required if respondent is the debtor.

CSD 1161

00246 OPP 1
44 BC

CSD 1161 (Page 2) [05/15/03]

Respondent alleges the following in opposition to the Motion:

1.  [X]  The following real property is the subject of this Motion:
    a.      Street address of the property including county and state:

            1463 La Honda Dr.; Escondido, CA 92027

    b.      Type of real property (e.g., single family residence, apartment building, commercial, industrial, condominium, unimproved):
            Single family residence

    c.      Legal description of property is attached as Exhibit A.

    d.      **Fair market value of property: $ 650,000 to 1,500,000.

    e.      **Nature of Respondent's interest in the property: fee simple subject to deed of trust

2.  [ ]  The following personal property is the subject of this Motion *(describe property)*:

    a.      **Fair market value of property: $_____.

    b.      **Nature of Respondent's interest in the property:

3.      Status of Movant's loan:
    a.      Balance owing on date of Order for Relief:          $1,207,000
    b.      Amount of monthly payment:                           $    6,667.04
    c.      Date of last payment:                                 2009
    d.      If real property,
            (1)     Date of default:                              2009
            (2)     Notice of Default recorded on:                9/13/2011
            (3)     Notice of Sale published on:                  12/15/2011
            (4)     Foreclosure sale currently scheduled for:     _____
    e.      If personal property,
            (1)     Pre-petition default:      $_____   No. of months:_____
            (2)     Post-petition default:     $_____   No. of months:_____

4.      *(If Chapter 13 Case, state the following:)*
    a.      Date of post-petition default:                _____
    b.      Amount of post-petition default:       $_____

5.      Encumbrances:
    a.      Voluntary encumbrances on the property:

| Lender Name | Principal Balance | Pre-Petition Arrearages Total Amount - # of Months | | Post-Petition Arrearages Total Amount - # of Months | |
|---|---|---|---|---|---|
| 1st: Kondaur Capital | $ 1,002,106.43 | Unk | 35 | | |
| 2nd: | | | | | |
| 3rd: | | | | | |
| 4th: | | | | | |
| Totals for all Liens: | $ 1,002,106.43 | $ per movant $ 295,034.55 | | $ | |

_____

**Separately filed Declaration required by Local Bankruptcy Rule 4001-4.

CSD 1161

CSD 1161 (Page 3) [05/15/03]

    b.    Involuntary encumbrances of record (e.g., tax, mechanic's, judgment and other liens, lis pendens):
        ☒ See attached page, if necessary.

              Property Taxes due

6.    Relief from the automatic stay should not be granted because:

    a.    ☐    Movant's interest in the property described above is adequately protected.

    b.    ☐    Debtor has equity in the property described above and such property is necessary to an effective reorganization.

    c.    ☐    The property is not "single asset real estate", as defined in 11 U.S.C. § 101(51B).

    d.    ☒    The property is "single asset real estate", as defined in 11 U.S.C. § 101(51B), and less than 90 days (or _____ days ordered by this court) have passed since entry of the order for relief in this case, or

        (1)    the Debtor/Trustee has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or

        (2)    the Debtor/Trustee has commenced monthly payments to each creditor whose claim is secured by the property (other than a claim secured by a judgment lien or by an unmatured statutory lien) which payments are equal to interest at a current fair market rate on the value of each creditors' interest in the property.

    e.    ☒    Other *(specifiy)*:  ☒ See attached page.

        Movant does not have the right to foreclose as it is not the beneficiary of record.

When required, Respondent has filed a separate Declaration pursuant to Local Bankruptcy Rules 4001-4.

Respondent attaches the following:

1.    ☒    Other relevant evidence: as attached and referred to in points and authorities.

2.    ☒    *(Optional)* Memorandum of points and authorities upon which the responding party will rely.

WHEREFORE, Respondent prays that this Court issue an Order denying relief from the automatic stay.

Dated: February 6, 2012

                  [Attorney for] Respondent

CSD 1161

## DECLARATION OF LORAN KELLEY

I Loran Kelley, Jr. declare:

1.     I am the debtor herein, owner of and resident in the residential real property located at 1463 La Honda Drive, Escondido, CA and make this declaration in support of my opposition to Kondaur Capital's Motion for Relief from Stay. I know the facts stated herein of my own personal knowledge and if called as a witness I would and could truthfully testify as to each of these facts except to those facts stated on information and belief and I understand and believe those facts to be true based on information provided to me.

2.     On or about April 10, 2007 I purchased fee simple title to real property situated on 1463 La Honda Drive, Escondido, San Diego County, California 92027 more particularly described as,

> That Portion of the Northeast Quarter of the Southwest Quarter of Section 2, Township 12 South, Range 2 West, San Bernardino Base and Meridian, in the City of Escondido, County of San Diego, State of California according to the Official Plat thereof, and that Portion of Lot 1 of Moe's Subdivision, in said County, according to Map thereof No. 803, filed in the Office of the County Recorder of San Diego County on July 22, 1895, all as more particularly described in Exhibit A attached hereto.

3.     On or about July 19, 2007 I borrowed the sum of $ 960,000 as a loan from Quick Loan Funding, Inc. That loan was documented by a promissory note dated July 11, 2007 (See Exhibit 1 attached hereto) which was secured by a deed of trust which was recorded on July 20, 2007 in the Office of the San Diego County Recorder as Doc. No. 2007-0486457 (hereafter the "Deed of Trust") which recites transfer of the Property in trust to Chicago Title as security for repayment of the Note. (See Exhibit 2 attached hereto.) The Promissory Note was in favor of Quick Loan Funding, Inc. without mention of any ownership of the note by Mortgage Electronic Registration System (MERS) or any other person or entity.

4.     This Deed of Trust listed "Lender" as Quick Loan Funding, Inc., Chicago Title as "Trustee" and MERS, purportedly acting as "nominee" for Quick Loan Funding, Inc. and its successors and assigns. MERS has no apparent economic interest in the Note secured by the Deed of Trust. (See Paragraphs C-E on page one of Exhibit 2 attached).

5.     On or about March 3, 2008 loan servicing company Quantum Servicing Corporation,

1    claiming to act on behalf of the owner of the note, proposed a refinance of the July 11, 2007 loan on certain

2    specified terms. I accepted that proposal and paid over $ 40,000 to meet the terms specified for the proposed

3    loan modification on or about December 1, 2008.

4        6.        On or about January 5, 2010 KONDAUR CAPITAL CORPORATION wrote me claiming

5    to be the "servicer" and "investor" on the loan on my property and informing me that the loan transfer would

6    be effective as of January 19, 2010.  I have received no other notice of assignment of the Quick Loan

7    Funding, Inc. note and deed of trust to KONDAUR CAPITAL CORPORATION nor have I been informed

8    of any prior transfers of the note and deed of trust.

9        7.        I have researched the public record and declare that it shows on or about July 29, 2008

10   Mortgage Electronic Registration Systems, Inc. purportedly assigned "all beneficial interest under that

11   certain deed of trust dated July 7, 2007 . . ." to Citigroup Global Markets Realty Corporation.  The purported

12   assignment makes no mention of an assignment of the July 11, 2007 note.   (See Exhibit 3 attached).

13       8.        I have researched the public record and declare that it shows on October 20, 2010,

14   KONDAUR CAPITAL CORPORATION recorded a Notice of Default and Election to Sell as Doc. No.

15   2010-0562849 at the office of the San Diego County Recorder's office which recites the beneficiary of the

16   Deed of Trust as MERS.  This Notice was signed by Layne Lambert, Assistant Secretary, on behalf of Old

17   Republic Default Management Services as agent for an unspecified "beneficiary."   MERS is the only

18   identified beneficiary on the Notice of Default and Election to Sell. (See Exhibit 4 attached).

19       9.        I have researched the public record and declare that it shows KONDAUR CAPITAL

20   CORPORATION caused a document entitled Assignment of Deed of Trust to be recorded December 17,

21   2010 by the terms of which Citigroup Global Markets Realty Corporation purportedly assigned "all its right,

22   title and interest in and to a certain Deed of Trust executed by Loran Kelley, Jr. to Mortgage Electronic

23   Registration Systems, Inc. (MERS) as nominee for Quick Loan Funding Inc. and bearing the date of July

24   11, 2007 and recorded as Instrument Number 2007-0486457 on July 20, 2007 . . . " "Together with the; note

25   or notes therein described or referred to, . . ."  (See Exhibit 5 attached.)

26       10.       I have researched the public record and declare that it shows on January 7, 2011 KONDAUR

27   CAPITAL CORPORATION and MTC FINANCIAL, INC. dba Trustee Corps. caused a document titled

28   "Substitution of Trustee" dated November 24, 2010, notarized November 30, 2010 to be recorded in the

1 | office of the San Diego County Recorder over the signature of Donald Duncan without designated capacity
2 | on behalf of Kondaur Capital Corporation.  (See Exhibit 6 attached.)

3 |      11.    I have researched the public record and declare that it shows on January 7, 2011, seventy-nine
4 | days after recording the Notice of Default,  KONDAUR CAPITAL CORPORATION caused a Notice of
5 | Trustee's Sale for February 14, 2011 to be recorded at the office of the San Diego County Recorder as Doc.
6 | No. 2011-0012556 which recites **the beneficiary of the Deed of Trust as Quick Loan Funding, Inc.**  The
7 | recording of that Notice of Trustee's Sale was invalid in that it was statutorily premature.  (See Exhibit 7
8 | attached.)

9 |      12.    On or about March 18, 2011  KONDAUR CAPITAL CORPORATION caused the Property
10 | to be posted with a Notice of Trustee's Sale for April 12, 2011.  I have researched the public record and
11 | declare that it shows this Notice of Sale was recorded March 21, 2011 as Doc. No. 2011-0146792.  This
12 | Notice of Trustee's Sale states that Quick Loan Funding Inc. was the beneficiary under the July 20, 2007
13 | Deed of Trust.  (See Exhibit 8 attached.)

14 |      13.    I have researched the public record and declare that it shows on March 21, 2011  KONDAUR
15 | CAPITAL CORPORATION and MTC FINANCIAL, INC. dba Trustee Corps. caused a document titled
16 | "Substitution of Trustee" dated November 24, 2010, notarized November 30, 2010 to be recorded in the
17 | office of the San Diego County Recorder over the signature of Janice Ramocinski without designated
18 | capacity on behalf of Kondaur Capital Corporation.  This Substitution of Trustee states that **Quick Loan**
19 | **Funding Inc. was the original beneficiary** under the July 20, 2007 Deed of Trust. (See Exhibit 9 attached.)

20 |      14.    On or about April 8, 2011 I received a copy of the April 7, 2011 letter from  Kondaur Capital
21 | Corporation addressed to Loran Kelley, Jr. and noted it stated that the note and deed of trust had been
22 | assigned to "Kondaur Capital Trust Series 2009-5" effective January 19, 2010.  That letter also stated, "The
23 | above stated transfer of ownership was not recorded."  (See Exhibit 10 attached.)

24 |      15.    On or about June 1, 2011 I received a copy of the May 31, 2011 Substitution of Trustee dated
25 | and notarized on May 31, 2011to be recorded in the office of the San Diego County Recorder over the
26 | signature of John Kontoulis, as President of Kondaur Capital Corporation.  This Substitution of Trustee
27 | states that **Mortgage Electronic Registration Systems, Inc. was the original beneficiary** under the July
28 | 20, 2007 Deed of Trust.  (See Exhibit 11 attached.)

16.    I have researched the public record and declare that it shows on December 15, 2011 KONDAUR CAPITAL CORPORATION recorded a Notice of Default and Election to Sell as Doc. No. 2011-0674175 at the office of the San Diego County Recorder's office which recites the beneficiary of the Deed of Trust as MORTGAGE ELECTRONIC REGISTRATION SYSTEM, INC. This Notice was signed by Tony Delgado, Trustee Sale Officer on behalf of Old Republic Default Management Services as agent for an unspecified "beneficiary." MERS is the only identified beneficiary on the Notice of Default and Election to Sell. (See Exhibit 12 attached).

I declare under penalty of perjury under the laws of the State of California. Executed in Escondido, California on February 6, 2012.



Loran Kelley Jr.

### POINTS AND AUTHORITIES IN OPPOSITION TO RELIEF FROM STAY

Before the Court is a motion (the "Motion") seeking relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1) and (2), to foreclose on a secured interest in the Debtor's real property located in Escondido, California (the "Property"). The movant is Kondaur Capital Corporation ("Kondaur" or "Movant"). This is Debtor's opposition to the Motion contesting the Movant's standing to seek relief from stay.

Debtor contends that no assignment of record exists of the underlying note by the original lender, Quick Loan Funding, Inc. The only interest Kondaur holds is that it acquired by way of an Assignment of Deed of Trust from Citigroup Global Markets Realty Corporation recorded December 17, 2010. See Exhibit 5 attached. On July 29, 2008 an Assignment of Deed of Trust from Mortgage Electronic Registration System (MERS) purportedly assigned Deed of Trust along with the underlying Promissory Note. See Exhibit 3 attached.

The Debtor asserts there is a fundamental question as to whether MERS had the legal authority to assign a valid and enforceable interest in the subject mortgage because Kondaur's rights can be no greater than the rights as transferred by its assignor – MERS – Debtor argues that the Movant has failed to establish

that it holds an enforceable right against the Property.

## STATEMENT OF PERTINENT FACTS

On or about April 10, 2007 debtor purchased fee simple title to real property situated on 1463 La Honda Drive, Escondido, San Diego County, California 92027 more particularly described as,

> That Portion of the Northeast Quarter of the Southwest Quarter of Section 2, Township 12 South, Range 2 West, San Bernardino Base and Meridian, in the City of Escondido, County of San Diego, State of California according to the Official Plat thereof, and that Portion of Lot 1 of Moe's Subdivision, in said County, according to Map thereof No. 803, filed in the Office of the County Recorder of San Diego County on July 22, 1895, all as more particularly described in Exhibit A attached hereto.

On or about July 19, 2007 debtor borrowed the sum of $ 960,000 as a loan from Quick Loan Funding, Inc. That loan was documented by a promissory note dated July 11, 2007 (See Exhibit 1 attached hereto) which was secured by a deed of trust which was recorded on July 20, 2007 in the Office of the San Diego County Recorder as Doc. No. 2007-0486457 (hereafter the "Deed of Trust") which recites transfer of the Property in trust to Chicago Title as security for repayment of the Note. (See Exhibit 2 attached hereto.) The Promissory Note was in favor of Quick Loan Funding, Inc. without mention of any ownership of the note by Mortgage Electronic Registration System (MERS) or any other person or entity.

This Deed of Trust listed "Lender" as Quick Loan Funding, Inc., Chicago Title as "Trustee" and MERS, purportedly acting as "nominee" for Quick Loan Funding, Inc. and its successors and assigns. MERS has no apparent economic interest in the Note secured by the Deed of Trust. (See Paragraphs C-E on page one of Exhibit 2 attached).

On or about March 3, 2008 loan servicing company Quantum Servicing Corporation, claiming to act on behalf of the owner of the note, proposed a refinance of the July 11, 2007 loan on certain specified terms. Debtor accepted that proposal and paid over $ 40,000 to meet the terms specified for the proposed loan modification on or about December 1, 2008.

On or about January 5, 2010 KONDAUR CAPITAL CORPORATION wrote debtor claiming to be the "servicer" and "investor" on the loan on my property and informing debtor that the loan transfer

1   would be effective as of January 19, 2010.  Debtor has received no other notice of assignment of the

2   Quick Loan Funding, Inc. note and deed of trust to KONDAUR CAPITAL CORPORATION nor has

3   debtor been informed of any prior transfers of the note and deed of trust.

4       On or about July 29, 2008 Mortgage Electronic Registration Systems, Inc. purportedly assigned

5   "all beneficial interest under that certain deed of trust dated July 7, 2007 . . ." to Citigroup Global

6   Markets Realty Corporation.  The purported assignment makes no mention of an assignment of the July

7   11, 2007 note.   (See Exhibit 3 attached).  Debtor is unaware of any assignment of the note itself to any

8   party.

9       On October 20, 2010, KONDAUR CAPITAL CORPORATION recorded a Notice of Default

10   and Election to Sell as Doc. No. 2010-0562849 at the office of the San Diego County Recorder's office

11   which recites **the beneficiary of the Deed of Trust as MERS**.  This Notice was signed by Layne

12   Lambert, Assistant Secretary, on behalf of Old Republic Default Management Services as agent for an

13   unspecified "beneficiary."   MERS is the only identified beneficiary on the Notice of Default and

14   Election to Sell. (See Exhibit 4 attached).

15       KONDAUR CAPITAL CORPORATION caused a document entitled Assignment of Deed of

16   Trust to be recorded December 17, 2010 by the terms of which Citigroup Global Markets Realty

17   Corporation purportedly assigned "all its right, title and interest in and to a certain Deed of Trust

18   executed by Loran Kelley, Jr. to Mortgage Electronic Registration Systems, Inc. (MERS) as nominee for

19   Quick Loan Funding Inc. and bearing the date of July 11, 2007 and recorded as Instrument Number

20   2007-0486457 on July 20, 2007 . . . " "Together with the; note or notes therein described or referred to, .

21   . ." (See Exhibit 5 attached.)

22       On January 7, 2011 KONDAUR CAPITAL CORPORATION and MTC FINANCIAL, INC. dba

23   Trustee Corps. caused a document titled "Substitution of Trustee" dated November 24, 2010, notarized

24   November 30, 2010 to be recorded in the office of the San Diego County Recorder over the signature of

25   Donald Duncan without designated capacity on behalf of Kondaur Capital Corporation.  (See Exhibit 6

26   attached.)

27       On January 7, 2011, seventy-nine days after recording the Notice of Default, KONDAUR

28   CAPITAL CORPORATION caused a Notice of Trustee's Sale for February  14, 2011 to be recorded at

the office of the San Diego County Recorder as Doc. No. 2011-0012556 which recites **the beneficiary of the Deed of Trust as Quick Loan Funding, Inc.**   The recording of that Notice of Trustee's Sale was invalid in that it was statutorily premature.  (See Exhibit 7 attached.)

On or about March 18, 2011 KONDAUR CAPITAL CORPORATION caused the Property to be posted with a Notice of Trustee's Sale for April 12, 2011.  I have researched the public record and declare that it shows this Notice of Sale was recorded March 21, 2011 as Doc. No. 2011-0146792.  This Notice of Trustee's Sale states that Quick Loan Funding Inc. was the beneficiary under the July 20, 2007 Deed of Trust.  (See Exhibit 8 attached.)

On March 21, 2011 KONDAUR CAPITAL CORPORATION and MTC FINANCIAL, INC. dba Trustee Corps. caused a document titled "Substitution of Trustee" dated November 24, 2010, notarized November 30, 2010 to be recorded in the office of the San Diego County Recorder over the signature of Janice Ramocinski without designated capacity on behalf of Kondaur Capital Corporation.  This Substitution of Trustee states that **Quick Loan Funding Inc. was the original beneficiary** under the July 20, 2007 Deed of Trust.  (See Exhibit 9 attached.)

On or about April 8, 2011 debtor received a copy of an April 7, 2011 letter from KONDAUR CAPITAL CORPORATION addressed to Loran Kelley, Jr. and noted it stated that the note and deed of trust had been assigned to "Kondaur Capital Trust Series 2009-5" effective January 19, 2010.  That letter also stated, "The above stated transfer of ownership was not recorded." (See Exhibit 10 attached.)

On or about June 1, 2011 debtor received a copy of the May 31, 2011 Substitution of Trustee dated and notarized on May 31, 2011to be recorded in the office of the San Diego County Recorder over the signature of John Kontoulis, as President of Kondaur Capital Corporation.  This Substitution of Trustee states that **Mortgage Electronic Registration Systems, Inc. was the original beneficiary** under the July 20, 2007 Deed of Trust.  (See Exhibit 11 attached.)

On December 15, 2011 KONDAUR CAPITAL CORPORATION recorded a Notice of Default and Election to Sell as Doc. No. 2011-0674175 at the office of the San Diego County Recorder's office which recites the beneficiary of the Deed of Trust as MORTGAGE ELECTRONIC REGISTRATION SYSTEM, INC.  This Notice was signed by Tony Delgado, Trustee Sale Officer on behalf of Old Republic Default Management Services as agent for an unspecified "beneficiary."   MERS is the only

1    identified beneficiary on the Notice of Default and Election to Sell. (See Exhibit 12 attached).

2                                             **III**

3                                       **ARGUMENT**

4        Debtor LORAN KELLEY, JR. is the trustor under the deed of trust and asserts that Kondaur

5    Capital Corporation's Motion for Relief from Stay should be denied because of the following fatal

6    deficiencies:

7    **A. KONDAUR's Standing to Seek Relief from the Automatic Stay**

8        Debtor challenges the Movant's standing to seek relief from the automatic stay.  Standing is a

9    threshold issue for a court to resolve. Section 362(d) states that relief from stay may be granted "[o]n

10   request of a party in interest and after notice and a hearing." 11 U.S.C. § 362(d). The term "party in

11   interest" is not defined in the Bankruptcy Code, however the Court of Appeals for the Second Circuit

12   has stated that "[g]enerally the 'real party in interest' is the one who, under the applicable substantive

13   law, has the legal right which is sought to be enforced or is the party entitled to bring suit." See Roslyn

14   Savings Bank v. Comcoach (In re Comcoach), 698 F.2d 571, 573 (2d Cir. 1983).

15       The legislative history of Section 362 "suggests that, notwithstanding the use of the term 'party

16   in interest', it is only creditors who may obtain relief from the automatic stay." Id. at 573-74. (citing H.R.

17   Rep. No. 95-595, 95th Cong., 1st Sess. 175, reprinted in 1978 U.S.Code Cong. & Ad. News 5787,

18   6136); see also Greg Restaurant Equip. And Supplies v. Toar Train P'ship (In re Toar Train P'ship), 15

19   B.R. 401, 402 (Bankr. D.Vt.1981) (finding that a judgment creditor of the debtor was not a "party in

20   interest" because the judgment creditor was not itself a direct creditor of the bankrupt).

21       This Court must determine whether the Movant is the "one who, under applicable substantive

22   law, has the legal right" to enforce the subject Note and Mortgage, and is therefore a "creditor" of this

23   Debtor. See In re Toar, 15 B.R. at 402; see also In re Mims, 438 B.R. 52, 55 (Bankr. S.D.N.Y. 2010).

24       The Bankruptcy Code defines a "creditor" as an "entity that has a claim against the debtor that

25   arose at the time of or before the order for relief . . . ." 11 U.S.C. § 101(10). "Claim" is defined as the

26   "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed,

27   contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured . . . ." 11

28   U.S.C. § 101(5)(A). In the context of a lift stay motion where the movant is seeking to commence or

1   continue with an action to foreclose a mortgage against real property, the movant must show that it is a

2   "party in interest" by showing that it is a creditor with a security interest in the subject real property. See

3   Mims, 438 B.R. at 57 (finding that as movant "failed to prove it owns the Note, it has failed to establish

4   that it has standing to pursue its state law remedies with regard to the Mortgage and Property"). Cf.

5   Brown Bark I L.P. v. Ebersole (In re Ebersole), 440 B.R. 690, 694 (Bankr. W.D. Va. 2010) (finding that

6   movant seeking relief from stay must prove that it is the holder of the subject note in order to establish a

7   'colorable claim' which would establish standing to seek relief from stay).

8   **B. Noteholder Status**

9         In the Motion, the Movant apparently asserts it is the "holder" of the Note. However, in order to

10   have standing to seek relief from stay, Movant, must show that it holds both the Deed of Trust and the

11   Note. Mims, 438 B.R. at 56. Although the Motion does contend Kondaur is the holder of the Note, it has

12   produced no evidence of any endorsement of the original note in its favor.  Instead it apparently relies

13   only on the recitation of assignment of the note as set forth in the recorded assignment from MERS to

14   Citigroup Global Markets Realty.  See Exhibit 3.

15         It is Movant's burden to show that it is the holder of the Note as well as the Deed of Trust.

16   Under California law, Movant can prove that MERS was entitled to assign the note to Citigroup Global

17   Markets Realty by providing the Court with proof of a written assignment of the Note by Quick Loan

18   Funding, Inc., or by demonstrating that it has physical possession of the Note endorsed over to it by

19   Quick Loan Funding, Inc.  See, e.g., LaSalle Bank N.A. v. Lamy, 824 N.Y.S.2d 769 (N.Y. Sup. Ct. Aug.

20   7, 2006).

21         Indeed, the only written assignment presented to the Court is not an assignment of the Note but

22   rather an "Assignment of Deed of Trust" from MERS to Citigroup Global Markets Realty which

23   contains a vague reference to the Note tagged to the end of the provisions which purport to assign the

24   Deed of Trust.  That language reads, ". . . together with the Promissory Note secured by said Deed of

25   Trust . . ."

26         Not only is the language vague and insufficient to prove Quick Loan Funding's intent to assign

27   the Note, but MERS is not a party to the Note and the record is barren of any representation that MERS,

28   the purported assignee, had any authority to take any action with respect to the Note.

1    Therefore, Debtor submits this court should find that the July 29, 2008 MERS to Citigroup

2    Global Markets Realty Assignment of Deed of Trust (Exhibit 3 attached) is not sufficient to establish an

3    effective assignment of the Note.

4    Absent a showing of a valid assignment of the Note, Movant can alternatively demonstrate that it

5    is the holder of the Note if it can show that it has physical possession of the Note endorsed to its name

6    by the original lender Quick Loan Funding, Inc . See In re Mims, 423 B.R. at 56-57.

7    **C. Necessity of Quick Loan Funding Assignment of Both the Note and Deed of Trust**

8    The Movant's failure to show that it holds the Note validly endorsed by Quick Loan Funding,

9    Inc. should be fatal to the Movant's standing. However, even if the Movant could show that it is the

10   holder of the Note, it still would have to establish that there has been a valid Quick Loan Funding

11   assignment of both the note and the Deed of Trust Mortgage in order to prove that it is a secured creditor

12   with standing to bring this Motion before this Court.

13   While it is generally true that a mortgage travels a parallel path with its corresponding debt

14   obligation, the documents provided in this case do not support that proposition.  In its letter of April 7,

15   2011 to Debtor, (Lodged Exhibit 10)  KONDAUR CAPITAL CORPORATION concedes it owns no

16   interest in the Note and Deed of Trust being foreclosed in the on October 20, 2010 Notice of Default and

17   that the transfer of ownership to the true owner was not recorded.  The plain language of statute provides

18   that the power of sale may not be exercised by the assignee unless the assignment is duly acknowledged

19   and recorded.  Civil Code § 2932.5.

20   While the exact language of Civil Code section 2932.5 mentions mortgages and not deeds of

21   trust, the distinction between the two instruments is obsolete. N Brand Partners v. Colony GFP Partners,

22   L.P. (In re 240 N Brand Partners), 200 B.R. 653, 658 (B.A.P. 9th Cir. 1996) ("The terminology creates a

23   difference without distinction."); Yulaeva v. Greenpoint Mortg. Funding, Inc., No. S-09-1504,2009 U.S.

24   Dist. LEXIS 79094, at *4 (E.D. Cal. Sept. 3, 2009) (citing 4 B.E. Witkin, Summary of California Law,

25   ch. VIII, § 5 (10th ed. 2005)); Bank of Italy Nat. Trust & Sav. Assn. v. Bentley, 217 Cal. 644, 656, 20

26   P.2d 940 (1933) (legal title under a deed of trust, though held by the trustee to the extent necessary for

27   execution of the trust, does not carry any "incidents of ownership of the property"); see also 1 Roger

28   Bernhardt, California Mortgages, Deeds of Trust, and Foreclosure Litigation, § 1.35 (4th ed. 2009);

1    Bank of Italy Nat. Trust & Sav. Assn. v. Bentley, 217 Cal. 644, 656, 20 P.2d 940 (1933) (legal title

2    under a deed of trust, though held by the trustee to the extent necessary for execution of the trust, does

3    not carry any "incidents of ownership of the property"); 4 Harry D. Miller & Marvin B. Starr, Miller &

4    Starr California Real Estate, § 10:1 n. 9 (3d 2010)(citing Domarad v. Fisher & Burke,

5    Inc., 270 Cal. App. 2d 543, 553, 76 Cal. Rptr. 529 (1st Dist. 1969)) (mortgages and deeds of trust

6    have the same effect and economic function and are "subject to the same procedures and limitations on

7    judicial and nonjudicial foreclosure").

8           The March 21, 2011 Substitution of Trustee (Lodged Exhibit 9) upon which the Notice of Sale

9    (Lodged Exhibit 8) is based was not signed by either all or fifty percent (50%) of the record beneficial

10    interest and is therefore fatally defective.  Civil Code § 2934a.  Civil Code § 2934a establishes the only

11    effective statutory method of substituting a trustee under a deed of trust.  Dimock v. Emerald Properties

12    (2000) 81 Cal.App.4th 868, 871.  MTC FINANCIAL INC. dba Trustee Corps as Trustee, was not a duly

13    substituted trustee because the substitution was not signed by all or fifty percent (50%) of the

14    beneficiaries.

15           Caselaw and commentary addressing MERS's role in the mortgage recording and foreclosure

16    process abound. See Christopher L. Peterson, Foreclosure, Subprime Mortgage Lending, and the

17    Mortgage Electronic Registration System, 78 U. Cin. L. Rev. 1359 (2010). In a 2006 published opinion,

18    the New York Court of Appeals described MERS system as follows:

19           In 1993, the MERS system was created by several large participants in the real
             estate mortgage industry to track ownership interests in residential mortgages.
20           Mortgage lenders and other entities, known as MERS members, subscribe to the
             MERS system and pay annual fees for the electronic processing and tracking of
21           ownership and transfers of mortgages. Members contractually agree to appoint
             MERS to act as their common agent on all mortgages they register in the MERS
22           system.

23           The initial MERS Deed of Trust (Exhibit 2) is recorded in the County Clerk's office with

24    'Mortgage Electronic Registration Systems, Inc.' named as the lender's nominee or mortgagee of record

25    on the instrument. During the lifetime of the mortgage, the beneficial ownership interest or servicing

26    rights may be transferred among MERS members (MERS assignments), but these assignments are not

27    publicly recorded; instead they are tracked electronically in MERS's private system. In the MERS

28    system, the mortgagor is notified of transfers of servicing rights pursuant to the Truth in Lending Act,

1    but not necessarily of assignments of the beneficial interest in the mortgage. Merscorp, Inc., v.

2    Romaine, 8 N.Y.3d 90 (N.Y. 2006) (footnotes omitted).

3        Circumventing the public recordation system is the purpose for which the MERS system was

4    created. Merscorp, Inc. v. Romaine, 8 N.Y.3d 90, 861 N.E.2d 81, 828 N.Y.S.2d 26, 2006 NY Slip Op.

5    9500, slip op. 6 (Ct. of Appeals 2006). Creation of a private system, however, is not enforceable to the

6    extent that it departs from California law.

7        A negotiable promissory note such as the Note can only be enforced in accordance with Article 3

8    of the Commercial Code ("CCC"), Cal. Com. Code §§ 1101-16104 (Deering 2011). The CCC permits

9    enforcement of a note by a party who: (1) holds a directly endorsed note (section 1201(b)(21));(2)

10    previously had the ability to enforce the note, but it was lost, destroyed, or stolen (section 3309);(3) has

11    possession of an endorsed-in-blank instrument (section 1201(b)(21)); or (4) can prove both possession of

12    the enforcement rights received from its transferor (section 3301). Id; In re McMullen Oil Co., 251 B.R.

13    558, 568 (Bankr.C.D. Cal. 2000); In Re Carlyle, 242 B.R. 881, 887 (Bankr. E.D. Va. 1999). These

14    requirements apply to every link in the chain of transfer of the note. Where a note has been assigned

15    several times, each assignment in the chain must be valid or the party claiming the note cannot

16    enforce it. In re Gavin, 319 B.R. 27, 32 (B.A.P. 1st Cir. 2004); In re Wells, 407 B.R. 873 (Bankr. N.D.

17    Ohio 2009). Even if a party is the owner of a promissory note, it is not entitled to enforce the note unless

18    it meets the statutory criteria for enforcement. Cal.Com. Code §3203(b) cmt. 2.

19        However, even if MERS had assigned the Deed of Trust Mortgage acting on behalf of Quick

20    Loan Funding, Inc. which held the Note at the time of the assignment, there has been no proof that

21    MERS had authority, as "nominee" or agent, to assign the Mortgage absent a showing that it was given

22    specific written directions by its principal.

23        This a theory that MERS's can act as a "common agent" for undisclosed principals is not support

24    by the law. The relationship between MERS and its lenders and its distortion of its alleged "nominee"

25    status was appropriately described by the Supreme Court of Kansas as follows: "The parties appear to

26    have defined the word [nominee] in much the same way that the blind men of Indian legend described an

27    elephant – their description depended on which part they were touching at any given time." Landmark

28    Nat'l Bank v. Kesler, 216 P.3d 158, 166-67 (Kan. 2010).

# IV

## CONCLUSION

For all of the foregoing reasons, debtor submits Kondaur's Motion for Relief from Stay should be denied.

Dated: _____

_____
Loran Kelley, Jr., Debtor pro se

**Exhibit 1**

MIN: 1003375-0707021948-6     **NOTE**     Loan Number: 400046753

JULY 11, 2007        COSTA MESA , STE 600        CALIFORNIA
[Date]               [City]              [State]

1463 LA HONDA DRIVE, ESCONDIDO, CALIFORNIA 92027
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 960,000.00      (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is QUICK LOAN FUNDING INC , A CALIFORNIA CORPORATION
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 9.250 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st day of each month beginning on SEPTEMBER 1 2007 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on AUGUST 1, 2037 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. BOX 6440, CAROL STREAM, ILLINOIS 60197-6440
or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 7,897.68

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit;

MULTISTATE FIXED RATE NOTE--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3200 1/01        Page 1 of 3        DocMagic eForms 800 649-1362
www.docmagic.com

and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

### 6.  BORROWER'S FAILURE TO PAY AS REQUIRED

**(A)  Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of        15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B)  Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)  Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D)  No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)  Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

### 7.  GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

### 8.  OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

### 9.  WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

### 10.  UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep

the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.**

_____ (Seal)
LORAN KELLEY, JR.          -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

*[Sign Original Only]*

MULTISTATE FIXED RATE NOTE--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3200  1/01                    Page 3 of 3

DocMagic €Forms 800-649-1362
www.docmagic.com

Pay to the order of
Without recourse
Quick Loan Funding, A
California Corporation
By
~~Terry Lobbes~~
Director of Operations

Exhibit 2

Recording requested by:
CHICAGO TITLE COMPANY

Recording Requested By:
QUICK LOAN FUNDING INC

5250

And After Recording Return To:
QUICK LOAN FUNDING, INC.
535 ANTON BLVD., SUITE 400
COSTA MESA, CALIFORNIA 92626
Loan Number: 400046753



DOC # 2007-0486457

JUL 20, 2007   11:31 AM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
GREGORY J. SMITH, COUNTY RECORDER
FEES:          54.00
PAGES:         16          DA:    1

2007-0486457

[Space Above This Line For Recording Data]

## DEED OF TRUST

MIN: 1003375-0707021948-6

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated    JULY 11, 2007    , together with all Riders to this document.
(B) "Borrower" is    LORAN KELLEY, JR., A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY

Borrower is the trustor under this Security Instrument.
(C) "Lender" is    QUICK LOAN FUNDING INC ,

Lender is a    CALIFORNIA CORPORATION                               organized
and existing under the laws of    CALIFORNIA
Lender's address is    535 ANTON BLVD, COSTA MESA., STE 600, CALIFORNIA 92626

(D) "Trustee" is    CHICAGO TITLE COMPANY
2365 NORTHSIDE DRIVE, SAN DIEGO, CALIFORNIA 92108

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) "Note" means the promissory note signed by Borrower and dated   JULY 11, 2007
The Note states that Borrower owes Lender   NINE HUNDRED SIXTY THOUSAND AND 00/100
Dollars (U.S. $ 960,000.00         ) plus interest.

DocMagic eFarms 800-649-1362
www.docmagic.com

5251

Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than AUGUST 1, 2037 .

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower (check box as applicable):

☐ Adjustable Rate Rider        ☐ Planned Unit Development Rider
☐ Balloon Rider                ☐ Biweekly Payment Rider
☐ 1-4 Family Rider             ☐ Second Home Rider
☐ Condominium Rider            ☐ Other(s) [specify]

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's

**5252**

covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
COUNTY                             of                      SAN DIEGO
[Type of Recording Jurisdiction]                [Name of Recording Jurisdiction]
SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N.: 225-020-04

which currently has the address of  1463  LA HONDA DRIVE
[Street]

ESCONDIDO                        , California    92027     ("Property Address"):
[City]                                    [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1.   Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not

**5253**

obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.   Application of Payments or Proceeds.  Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.   Funds for Escrow Items.  Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01                                   Page 4 of 14                            DocMagic ℯℱⓇⓇⓄⓇⓢ 800-649-1362
www.docmagic.com

5254

shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   Charges; Liens.  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any.  To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.  If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   Property Insurance.  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

5255

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

5256

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires seperately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

5257

Mortgage Insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether

5258

or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires

**5259**

otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

DocMagic @Rodmus 800-849-1382
www.docmagic.com

5260

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action

DocMagic eForms 800-649-1362
www.docmagic.com

**5261**

required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**5262**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
LORAN KELLEY, JR.        -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

Witness:                                Witness:

_____         _____

5263

———————————————— [Space Below This Line For Acknowledgment] ————————————————

State of California        )
                           ) ss.
County of SAN DIEGO        )

On ___7/11/07___ before me___ Stacy P. Schopinsky, *notary Public*

personally appeared ___LORAN KELLEY, JR.___

_____

_____

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

STACY P. SCHOPINSKY
COMM. # 1637815
NOTARY PUBLIC - CALIFORNIA
SAN DIEGO COUNTY
My Comm. Exp. SEPT. 13, 2010

NOTARY SIGNATURE

Stacy P. Schopinsky

(Typed Name of Notary)

NOTARY SEAL

DocMagic *eForms* 800-649-1362
www.docmagic.com

5264

# Exhibit "A"

**LEGAL DESCRIPTION**

**PARCEL 1:**

THAT PORTION OF THE NORTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 2, TOWNSHIP 12 SOUTH, RANGE 2 WEST, SAN BERNARDINO BASE AND MERIDIAN, IN THE CITY OF ESCONDIDO, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, AND THAT PORTION OF LOT 1 OF MOB'S SUBDIVISION, IN SAID COUNTY, ACCORDING TO MAP THEREOF NO. 803, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, JULY 22, 1895, LYING WITHIN THE FOLLOWING DESCRIBED BOUNDARIES:

BEGINNING AT THE NORTHEAST CORNER OF SAID SOUTHWEST QUARTER OF SAID SECTION 2; THENCE ALONG THE NORTH LINE OF SAID SOUTHWEST QUARTER, NORTH 88° 32' WEST 352.11 FEET TO TRUE POINT OF BEGINNING; THENCE CONTINUING NORTH 88° 32' WEST 315.54 FEET; THENCE SOUTH 3° 51' 50" WEST 462.29 FEET; THENCE SOUTH 44° 55' 10" EAST 230.32 FEET; THENCE SOUTH 59° 53' 50" EAST 154.15 FEET TO A LINE BEARING SOUTH 4° 09' 50" WEST FROM THE TRUE POINT OF BEGINNING; THENCE NORTH 4° 09' 50" EAST 695.52 FEET TO THE TRUE POINT OF BEGINNING

**PARCEL 2:**

AN EASEMENT AND RIGHT OF WAY FOR INGRESS AND EGRESS FOR ROAD PURPOSES OVER A STRIP OF LAND 20 FEET IN WIDTH, LOCATED WITHIN A PORTION OF LOT 1 OF SAID MOB'S SUBDIVISION, THE SOUTHWESTERLY LINE OF SAID 20 FOOT STRIP BEING DESCRIBED AS FOLLOWS

BEGINNING AT THE MOST SOUTHERLY CORNER OF THE PROPERTY ABOVE DESCRIBED; THENCE SOUTH 59° 53' 50" EAST 397.40 FEET TO A POINT IN THE WESTERLY LINE OF THE COUNTY ROAD, AS SAID ROAD IS DESCRIBED IN DEED TO THE COUNTY OF SAN DIEGO, RECORDED OCTOBER 13, 1932 IN BOOK 171, PAGE 112 OF OFFICIAL RECORDS, SAID 20 FOOT STRIP BEGINNING IN THE EASTERLY LINE OF THE PROPERTY FIRST ABOVE DESCRIBED AND TERMINATING IN THE WESTERLY LINE OF SAID COUNTY ROAD.

**PARCEL 3:**

AN EASEMENT AND RIGHT OF WAY FOR INGRESS AND EGRESS FOR ROAD PURPOSES OVER A STRIP OF LAND 15 FEET IN WIDTH, LOCATED WITHIN A PORTION OF THE NORTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 2, TOWNSHIP 12 SOUTH, RANGE 2 WEST, SAN BERNARDINO BASE AND MERIDIAN, IN THE CITY OF ESCONDIDO, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, AND WITHIN A PORTION OF LOT 1 OF MOB'S SUBDIVISION IN SAN DIEGO COUNTY, ACCORDING TO MAP THEREOF NO. 803, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, JULY 22, 1895, THE CENTER LINE OF SAID 15 FOOT STRIP BEING DESCRIBED AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTH LINE OF THE NORTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SAID SECTION 2, DISTANT THEREON NORTH 88° 32' WEST 352.11 FEET FROM THE NORTHEAST CORNER THEREOF, SAID POINT BEING THE NORTHEAST CORNER OF THAT LAND CONVEYED TO RALPH H. LA FON, ET UX, BY DEED RECORDED JULY 10, 1954 IN BOOK 5265, PAGE 72 OF OFFICIAL RECORDS; THENCE ALONG THE EASTERLY LINE OF LAND SO CONVEYED SOUTH 4° 09' 50" WEST 346.37 FEET TO THE TRUE POINT OF BEGINNING; THENCE SOUTH 86° 07' 10" EAST 106 FEET; THENCE SOUTH 27° 47' 10" EAST 85 FEET; THENCE SOUTH 34° 53'

DESCLTR-08/08/84bh

16

**5265**

10" EAST 191.90 FEET; THENCE SOUTH 19° 08' 10" EAST 47 FEET; THENCE SOUTH 5° 58' 50" WEST 129.77 FEET; THENCE SOUTH 7° 55' 10" EAST 46.57 FEET; THENCE SOUTH 28° 35' 10" EAST TO AN INTERSECTION WITH THE NORTHEASTERLY LINE OF THE 20 FOOT WIDE EASEMENT FOR ROAD PURPOSES DESCRIBED IN SAID DEED TO RALPH H. LA FON, ET UX, SAID 15 FOOT STRIP OF LAND BEGINS IN THE EASTERLY LINE OF SAID LA FON ON PROPERTY AND TERMINATES IN THE NORTHEASTERLY LINE OF SAID 20 FOOT STRIP.

# EXHIBIT 3

# EXHIBIT 3

16

FII

2P

RECORDING REQUESTED BY:
FIRST AMERICAN TITLE

Recording Requested By:
FIRST AMERICAN LOANSTAR TRUSTEE
SERVICES

When Recorded Mail To:
FIRST AMERICAN LOANSTAR TRUSTEE
SERVICES
P.O. BOX 961253
FT WORTH, TX 76161-0253    **1550**

DOC #    2008-0403748

JUL 29, 2008    8:00 AM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
GREGORY J. SMITH, COUNTY RECORDER
FEES:        14.00

DA:    1

PAGES:    2

Space above this line for Recorder's use only

APN:    225-020-04
TS No. :    2008917000003

Title Order No. : 3565154

EFFECTIVE
DATE
7/28/08

### ASSIGNMENT OF DEED OF TRUST

For Value Received, the undersigned corporation hereby grants, assigns, and transfers to:

CITIGROUP GLOBAL MARKETS REALTY CORPORATION

all beneficial interest under that certain Deed of Trust dated:  7/11/2007 executed by

LORAN KELLEY JR.

Trustor(s), to CHICAGO TITLE COMPANY, as Trustee, and recorded on 7/20/2007 as Instrument No. 2007-0486457, in Book , Page  in the office of the County Recorder of SAN DIEGO County, CALIFORNIA together with the Promissory Note secured by said Deed of Trust and also all rights accrued or to accrue under said Deed of Trust.

Dated: 7-24-08

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

Robin Buskirk
Vice President

State of:

County of:

On this the ____ day of _____, 20___, before me _____, the undersigned officer,

personally appeared _____, known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged that he/she/they executed the same for the purposes therein contained.

In witness whereof I hereunto set my hand.

Please See
attachment

_____
Notary Public Signature

Date Commission Expires: _____

X:\NDTS\LS13_4BO.RPT

1551

State of        TX

County of       TARRANT

Before me    Tanesa Sharron Frazier, on this day personally appeared    **Robin Buskirk**
known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to
me that this person executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 24th day of July            , A.D. 200 Г .

*Tanesa Sharron Frazier*
(Signature of Notary)

(Notary Seal)

